105 N.J. Super. 385 (1969)
252 A.2d 406
MARVIN HACKER AND EVELYN HACKER, PLAINTIFFS-RESPONDENTS,
v.
ROBERT STATMAN AND EAT MOR DISTRIBUTING CO., A CORPORATION OF NEW JERSEY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1969.
Decided April 24, 1969.
*388 Before Judges GAULKIN, COLLESTER and LABRECQUE.
*389 Mr. Sam Weiss argued the cause for appellants (Messrs. Jung, Selikoff, Rathman & Dwyer, attorneys).
Mr. H. Lee Sarokin argued the cause for respondents (Messrs. Lasser, Lasser, Sarokin & Hockman, attorneys; Messrs. Sarokin, Sheppard A. Guryan and Irving C. Marcus, on the brief).
The opinion of the court was delivered by LABRECQUE, J.A.D.
Defendants Robert Statman and Eat Mor Distributing Co. appeal from the granting of a new trial following a jury verdict in their favor, and from the entry of judgments based upon jury verdicts in favor of plaintiffs Evelyn Hacker and Marvin Hacker on retrial, and the denial of their subsequent motions for a new trial.
Although the record before us is lengthy, the facts are comparatively uncomplicated. On December 24, 1964, at approximately 5 P.M., defendant Statman, while operating an automobile owned by defendant Eat Mor in a westerly direction on Route 22, at a point a short distance west of the Union exit from the Garden State Parkway, collided with the rear of a vehicle driven by plaintiff Marvin Hacker in which Hacker's wife Evelyn and a Mrs. Hirschberg were passengers. Hacker testified that as he was proceeding in the inside (fast) lane at about 45 miles an hour, he glanced in his rear-view mirror and observed defendant's car some 400 or 500 feet to his rear. It was travelling downhill in the same lane at a speed of some 60-65 miles an hour when he observed it begin to skid, and then swerve into the right lane. Thereafter he heard the screeching of brakes and his car was struck in the rear by it. He testified that after the accident, in response to an inquiry as to what had happened, Statman told him that he had been up since early morning delivering Christmas presents, and was tired and in a hurry to get home. It had rained and it was wet and misty at the time. Both drivers proceeded on after identification and verification of licenses.
*390 Statman testified that as he was proceeding westerly at about 8-10 miles per hour in the inside (fast) lane, he had observed Hacker's car ahead of him. He described the accident thus:
"The cars in front of me had stopped. I saw these stop lights go on so I proceeded to put my foot on the brake. There was brake failure. Just before, prior to the time of the collision, the brakes locked in the car. My vehicle skidded into the vehicle in front of me."
He asserted that he had travelled some 40 to 45 feet from the time he applied his brakes until he struck the Hacker car. Although he testified the Hacker car had stopped approximately three to five feet behind it, it was not driven into the car ahead. He did not recall making the statement attributed to him by Hacker but conceded that he had been out delivering Christmas presents to his various customers that day.
In support of the defense that a latent defect in his brake system had caused the accident, Statman testified that he had experienced trouble with the power brakes three times over a three-month period and that the booster had been replaced on each occasion, the last time one week before the accident. The repairs had been made by an employee of defendant Eat Mor.
The case was submitted to the jury as to Statman's negligence and Hacker's contributory negligence. The issue of Mrs. Hacker's contributory negligence was withdrawn from the jury's consideration and it was instructed that any negligence on Hacker's part would not be imputable to her.
During the course of the jury's deliberations at the first trial it sent out a note to the judge which read, in pertinent part, as follows:
"If Mr. Statman is not negligent, can we award damages for the car only and not be contradictory in feeling that there should be no other award made or can we make any award for medical expenses and not declare Mr. Statman negligent."
*391 It was instructed that the amount of damages for the car was not in issue, and that it could not award medical expenses in case Mr. Statman was found not to be negligent. It thereupon resumed deliberating and returned a verdict of no cause for action.
On plaintiffs' motion the verdict was set aside and a new trial ordered. At the second trial the jury returned a verdict of $40,000 each in favor of Mrs. Hacker and her husband.

I
Defendants' first point challenges the order granting a new trial. They argue that the trial judge misconceived his duty in passing upon the motion, that he was restricted to canvassing the record for the sole purpose of determining whether reasonable minds might consider the evidence as adequate to support the jury's verdict, and since there was testimony in the case which would support the verdict, his action amounted to a manifest denial of justice which requires that it be set aside.
On a motion for a new trial on the ground that the verdict is contrary to the weight of the evidence, the trial judge may not substitute his judgment for that of the jury. He is required to canvass the record to determine whether reasonable minds might accept the evidence as adequate to support the jury's verdict. Kulbacki v. Sobchinsky, 38 N.J. 435, 445 (1962). But the presence of the mistake, passion, partiality or prejudice referred to in the rules may be inferred from factors other than the weight of the evidence. Here the trial judge determined:
"* * * the jury was prejudiced against Mrs. Hacker, wanted to give her nothing, but did desire to `reimburse' Mr. Hacker for his expenses. Since the Court had ruled that Mrs. Hacker had not been contributorily negligent, the jury probably realized that if it found Statman negligent, that it would be compelled to award damages to Mrs. Hacker. Apparently, this attitude was reflected in its verdict of `no cause for action.'
The verdict appeared to result from a balancing of the jury's determination not to award Mrs. Hacker damages against its desire to *392 be fair and `reimburse' Mr. Hacker. The Court is of the opinion that such a decision was based on prejudice and partiality and not on a weighing of the evidence as to the probable negligence of the defendant, Statman."
We cannot say that it clearly and unequivocally appears that the court's order for a new trial for the aforementioned reasons amounted to a manifest denial of justice under the law. Kulbacki, supra, at p. 446. The testimony as to defendants' negligence and the absence of negligence on Hacker's part preponderated in favor of plaintiffs. When considered in connection with the questions propounded to the court by the jury during its deliberations, it afforded an adequate basis for an inference that the verdict was not the result of a weighing of the evidence, but the product of partiality and prejudice. Whether the inference was to be drawn was for the trial judge. His affirmative determination is entitled to great weight. Hartpence v. Grouleff, 15 N.J. 545 (1954). He presumably had the "feel" of the case and was in a better position than we to judge whether justice had been done, having in mind the peculiar circumstances of the case and the weight of the credible evidence. Kulbacki, supra, at pp. 446, 459.

II
On the retrial the testimony coincided substantially with that given on the first trial, with the exception that Statman amplified his testimony concerning the asserted brake failure. He stated that on each occasion that brake repairs had been made a new power brake unit had been ordered directly from Chrysler Corporation and placed in the car. Over plaintiffs' objection he was permitted to state that Chrysler had sent out a letter recalling all cars of the model he was driving because of manufacturing difficulties in the power brake unit. However, on cross-examination he was unable to produce the letter and admitted that he had never seen it. In addition, he was unable to state whether the car had ever been returned to the dealer in response to the alleged letter.
*393 In rebuttal plaintiffs produced an automotive expert who had been employed by Chrysler for 30 years and had served during portions of that period as a field testing engineer and a regional service manager. He testified that to his knowledge Chrysler had never recalled the model in question because of defective brakes. In addition, he stated that even if the power booster had failed, the car's braking mechanism would still have functioned and the car could have been stopped, through the application of additional pressure on the brake pedal, within the same distance as would have been required had there been no failure.
At the conclusion of the testimony the trial judge (not the one who presided at the first trial) withdrew from the jury's consideration the issue of Hacker's asserted contributory negligence. As noted, the jury awarded $40,000 to Mrs. Hacker and $40,000 to her husband for his consequential damages. Defendants' motion for a new trial, as amplified by a number of supplementary motions, was denied by the trial judge.
We find defendants' contention that the striking of the defense of contributory negligence was error to be entirely lacking in merit. Defendants carried the burden of establishing that Hacker's conduct contributed to the happening of the accident. Dziedzic v. St. John's Cleaners & Shirt Launderers, Inc., 53 N.J. 157, 161 (1969). A review of the record reveals no testimony on which fair-minded men could have premised a finding of his contributory negligence. His own testimony was that as he had been moving ahead at about 40 to 45 miles an hour he was struck from behind by defendants' skidding and out-of-control car which had been proceeding at a speed of 60-65 miles an hour when he first observed it some 400-500 feet behind him. If defendant's testimony were to be accepted, he had been following plaintiff for a least a mile before the accident at a distance of 40-45 feet and at a speed of approximately 8 miles per hour. When he observed cars (of which plaintiff was one) stopping ahead of him, he applied his brakes but was unable to stop *394 within the 40-45 foot distance. Even if the jury believed defendant's testimony (which plaintiff and his witnesses denied), that plaintiff had stopped some three to five feet behind the car ahead, there was no testimony that he had stopped suddenly or that his conduct otherwise fell below the standard of reasonable care. The mere scintilla of evidence rule does not obtain in this State. Layton v. Healy, 12 N.J. Super. 459, 462 (App. Div. 1951). In the absence of disputed facts or disputed inferences to be drawn from the undisputed facts, it developed upon the court to declare the judgment which the law imposes. Kaufman v. Pennsylvania Railroad Co., 2 N.J. 318, 324 (1949).
Defendants urge that the verdict of $40,000 in favor of plaintiff husband was so excessive as to call for a new trial as to his damages.
The orthopedic surgeon who treated Mrs. Hacker testified that she sustained, among other injuries, severe sprains in the cervical and low back area with disc damage in both areas. She was originally hospitalized for three weeks during which time she was in cervical traction and on muscle relaxant medication. She was subsequently hospitalized from May 3 to May 18, 1965 and again from August 28 to September 25, 1965. During the latter period, she was again placed in traction. On October 19, 1965 she was again hospitalized and a body cast was applied. She was later fitted with a steel body brace.
On November 28, 1966 she was again hospitalized. A myelogram was first performed, which revealed a bulging disc in the lumbar area. Surgery, in the form of a laminectomy, was then carried out for removal of the disc. She was discharged on December 14, 1966. Her condition improved at first but later regressed.
Mrs. Hacker was still wearing a cervical collar and the steel brace at the time of trial. The orthopedic surgeon testified that as a result of the accident she had suffered permanent after-effects which limited her activities in almost every respect. His prognosis was that she should continue *395 to receive physiotherapy treatments and wear the brace, and if her complaints continued for three months more, which would have been a year from the time of her laminectomy, a spinal fusion would most likely be necessary. He described the proposed fusion operation, although he was precluded, on defendants' objection, from testifying as to its cost.
The trial judge determined that there had been no showing that the verdicts were the result of mistake, passion, partiality or prejudice. On the contrary, he found the proofs adequate to sustain the amounts returned by the jury. Kulbacki v. Sobchinski, supra, at 38 N.J. p. 445. In so doing he recognized the doctrine that courts will interfere with a verdict on the ground of excessiveness only with reluctance and never except in a clear case. Budd v. Erie Lackawanna R.R. Co., 98 N.J. Super. 47, 59 (App. Div. 1967), certification denied 51 N.J. 186 (1968).
On review we are restricted to determining whether, having due regard to the better opportunity of the trial judge to assess credibility, it clearly and convincingly appears that there has been a manifest denial of justice under the law. So tested, we see no cause to disturb the verdict. There was proof that over a period of two years and nine months Mr. Hacker had expended $7,489 for his wife's medical and hospital bills, and $3,081 for extra household help made necessary by her disability. In addition, she had required his assistance in bathing, dressing, walking and performing numerous other activities. She was still disabled and it was necessary that the physiotherapy treatments she had been receiving be continued. If her pain continued for an additional three months, it was "most likely" that it would be necessary for her to undergo a spinal fusion operation, with its attendant hospital, medical and post-operative expenses.
At 47 years Mrs. Hacker had an average life expectancy of 30.31 years. If allowance is made for the husband's actual out-of-pocket expense of $10,570, the jury awarded $29,430 *396 for his past and future loss of services and consortium and his future expenditures in caring for his wife and replacing her services in the household. Thus, for her average life expectancy of 30 years the jury allowed him less than $1,000 annually. This was less than the amount he had expended annually, up to the time of trial, for extra household help alone.
Defendants also assert as error the trial judge's failure to conduct a post-trial interrogation of the members of the jury. After the motion for a new trial was filed, defendants made a motion to be permitted to "examine or question the jurors * * * with relation to the verdict and deliberation thereon." It was supported by the affidavit of defendant Statman to the effect that Jane D. Mervine, one of the 14 jurors who had heard the case but had been excused when the number was reduced to 12, had telephoned him to say that Davis, one of the jurors who took part in the deliberations, "was against the defendants from the very beginning * * * because he had been through a disc operation a few years ago." She also allegedly volunteered to him that Gorski, another juror, wanted to give plaintiffs "the maximum award from the beginning" because of the appearance of the female plaintiff; that another, Mrs. Hinrich, had stated "that she didn't want to listen to any testimony either, * * * she was so impressed with plaintiff's attorney's looks and speech and that he was such a handsome young man." Statman's informant allegedly added that most, if not all of the jurors, had formed opinions "right from the beginning of the trial" and that they had discussed the case "each and every day" among themselves in violation of the court's instructions.
Thereafter, while the motion was pending, an investigator hired by defendants embarked upon an investigation of Davis which, according to the former's affidavit, revealed that some 12 years previously Davis had had an accident while painting the outside of his house in which he had sustained a pinched nerve in the upper part of his back for which he had been operated on at the Presbyterian Medical Center. *397 No affidavit by Mrs. Mervine was ever submitted. Statman's affidavit failed to state if and how he was able to assure himself that she was the one who had called him.
Defendants urge that, on the basis of the affidavits filed, they should have been permitted to interrogate Davis and the other jurors or, alternatively, that the trial judge should have conducted an investigation. Not so. With regard to Davis, the trial judge found, and we agree, that he was never asked at the voir dire whether he had ever been involved in an accident or had sustained a disc injury (which he apparently had not). This precluded any finding that he had concealed the fact that he had been in an accident at his home in which he had sustained a pinched nerve. Nowhere in the transcript of the voir dire does it appear that he was alerted to the necessity of making such a disclosure. Further, defendants' post-trial investigation of Davis was highly irregular and completely contrary to the letter and spirit of R.R. 1:25A. See State v. LaFera, 42 N.J. 97, 105-106 (1964). Under that rule the trial judge alone may authorize such an investigation.
There is a strong public policy against probing the motivations which inhere in a jury's verdict. State v. LaFera, supra, at p. 110. An inquiry such as the one here sought should not be ordered without a sufficient preliminary showing that a juror carried his prejudice, if any, into the juryroom. Ibid. Here Statman's affidavit, in addition to its hearsay taint, fell far short of the showing of good cause required by R.R. 1:25A. In the absence of good cause, jurors are to be protected against efforts to browse among their thoughts in search of something to invalidate their verdict. State v. LaFera, supra, pp. 106-107; cf. State v. La Rocca, 81 N.J. Super. 40, 44 (App. Div. 1963). As was said in State v. Athorn, 46 N.J. 247 (1966):
"If verdicts could be easily set aside as a result of an investigation into secret jury deliberations, disappointed litigants would be encouraged to tamper with jurors, to harass them and to employ fraudulent practices in an effort to induce them to repudiate their decisions. *398 Moreover, an open invitation would be extended to any disgruntled juror who might choose to destroy a verdict to which he had previously assented." (at p. 250)
While in Athorn the verdict was sought to be impeached by one of the jurors who took part in its rendition, the foregoing admonition would be equally, if not more applicable to one who did not participate in the deliberations.
We have reviewed the remaining points raised by defendants and, when considered in the context of the record before us, we find them to be without merit. The trial of the case began on September 11 and was concluded on September 29, 1967. The trial transcript alone contains 2,129 pages. Defendants have collated from this lengthy record a number of rulings and a number of comments (including some questions directed to witnesses) by the trial judge and challenge them as prejudicial error. As to such of them as involve the court's rulings in response to objections or motions by defendants, we find them to be free from error. As to the trial judge's comments of which defendants complain we are satisfied that, whether they be considered singly or together, they were harmless. R.R. 4:63-1. Some have been taken out of context and could not have been considered by the jury as carrying the meaning which defendants now seek to attribute to them. Others were not objected to below. Further, in the charge the jury was carefully cautioned to make its own appraisal of the facts and to disregard any comments or questions put to witnesses by the court.
Finally, we are convinced that there is no merit to defendants' contention that they were deprived of a fair trial by the manner in which the trial judge is alleged to have reacted in the presence of the jury to portions of the testimony adduced by them. In passing upon the motion for a new trial, the trial judge specifically denied this criticism of his conduct of the trial and our review of the record satisfies us that it is without merit. On the contrary, we conclude from the record that defendants were accorded a fair trial, during which the judge exhibited uniform courtesy *399 and restraint towards both sides in dealing with the many, and sometimes difficult and vexing questions which arose during this lengthy and sharply contested trial.
The judgment of the Law Division is accordingly affirmed.
GAULKIN, S.J.A.D. (concurring):
I concur with the majority opinion. In addition, I suggest that defendants' defense that the collision happened because of the failure of defendants' brakes should be held to be frivolous.
As the majority opinion points out, Statman testified that he had had trouble with the brakes three times in the previous three months, that on each occasion the brakes were repaired by an employee of defendant Eat Mor, and that the last repair was made one week before the accident. If it be too early to say that one who takes a motor vehicle upon the highway impliedly warrants that it is equipped with proper brakes in working order, as well as with whatever else is essential to prevent the vehicle from becoming a menace to others within its range, it is not too early to say that when one knows that his brakes are defective, their proper repair is a nondelegable duty, and if defendant himself makes the repairs he impliedly warrants their sufficiency and is strictly liable if the brakes then fail.
In Maloney v. Rath, 69 A.C. 455, 71 Cal. Rptr. 897, 445 P.2d 513 (Sup. Ct. 1968), defendant claimed her car ran into the rear of plaintiff's car because her brakes failed. The jury brought in a verdict of no cause for action. The California Supreme Court reversed and ordered the entry of judgment of liability in favor of plaintiff. Chief Justice Traynor said:
"Defendant neither knew nor had reason to know that her brakes were defective until they failed. The failure was caused by a rupture in a hydraulic hose that gave no warning to defendant of its impending occurrence. Defendant had the brakes completely overhauled by Peter Evanchik of Pete's Chevron Station about three months before the accident. Later, about two weeks before the accident, the car was involved in another collision, and defendant's husband had Evanchik inspect and repair it. Nothing was done to the brakes at that *400 time. Defendant's expert witness testified that the brakes failed because of a hole in the hydraulic hose that was caused by rubbing of the hose against the right front wheel. The rubbing resulted from faulty installation of the hose at the time the brakes were overhauled. A qualified person inspecting the brakes before they failed would have detected the faulty installation and the evidence of the rubbing.

* * * * * * * *
Defendant offered sufficient evidence to rebut the presumption that she was negligent. The brakes had been overhauled three months before the accident; the car was inspected for damage and repaired after another accident in the interim; and the brakes gave no warning to defendant of their impending failure. Moreover, she was not negligent in failing to discover the faulty installation of or the growing damage to the hose, for those defects would be apparent only to a mechanic.
Plaintiff contends, however, that proof that defendant was not herself negligent should not absolve her from liability for the damage caused by the failure of her brakes. She contends that the court should * * * hold that a motorist is strictly liable for damage caused by a brake failure or hold that the duty to exercise reasonable care to maintain adequate brakes is nondelegable."
The court refused to impose strict liability for brake failure. However, it said:
"It does not follow, however, that the duty to exercise reasonable care to maintain brakes so that they comply with the provisions of the Vehicle Code can be delegated. * * * We believe * * * that the law governing nondelegable duties dictates imposing such a duty here.

* * * * * * * *
Section 423 of the Restatement Second of Torts provides that `One who carries on an activity which threatens a grave risk of serious bodily harm or death unless the instrumentalities used are carefully * * * maintained, and who employs an independent contractor * * * maintain such instrumentalities, is subject to the same liability for physical harm caused by the negligence of the contractor in * * * maintaining such instrumentalities as though the employer had himself done the work of * * * maintenance.' Section 424 provides that `One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions.' Both of these sections point to a nondelegable duty in this case. The statutory provisions regulating the maintenance and equipment of automobiles constitute express legislative recognition of the fact that improperly maintained motor vehicles threaten `a *401 grave risk of serious bodily harm or death.' The responsibility for minimizing that risk or compensating for the failure to do so properly rests with the person who owns and operates the vehicle. He is the party primarily to be benefited by its use; he selects the contractor and is free to insist upon one who is financially responsible and to demand indemnity from him; the cost of his liability insurance that distributes the risk is properly attributable to his activities; and the discharge of the duty to exercise reasonable care in the maintenance of his vehicle is of the utmost importance to the public. * * *
In the present case it is undisputed that the accident was caused by a failure of defendant's brakes that resulted from her independent contractor's negligence in overhauling or in thereafter inspecting the brakes. Since her duty to maintain her brakes in compliance with the provisions of the Vehicle Code is nondelegable, the fact that the brake failure was the result of her independent contractor's negligence is no defense.
The judgment and the order denying the motion for judgment notwithstanding the verdict on the issue of liability are reversed and the case is remanded to the trial court for a new trial on the issue of damages only."
In Maloney v. Rath, supra, the repairs were made by an independent contractor. Since the repairs here were made by Eat Mor's own employees, the rationale of Maloney v. Rath, supra, should apply to the case at bar with even greater force. This is so even though defendants protest that the fault lay in the repair parts supplied by Chrysler.
Affirmed.