53 N.J. Super. 482 (1959)
147 A.2d 595
GREGORY MANOR, A CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
CITY OF CLIFTON AND PLANNING BOARD OF THE CITY OF CLIFTON, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1958.
Decided January 13, 1959.
*484 Before Judges PRICE, HALL and GAULKIN.
Mr. Aaron Heller argued the cause for plaintiff-appellant (Messrs. Heller & Laiks, attorneys).
Mr. Edward F. Johnson argued the cause for defendants-respondents.
The opinion of the court was delivered by PRICE, S.J.A.D.
Plaintiff instituted this action in the Superior Court, Chancery Division, seeking to set aside a deed from it to defendant municipality on the ground that the conveyance had been executed under duress and the compulsion of economic necessity. In the alternative, it sought recovery for the reasonable value of the property involved. The trial court entered judgment on the merits in favor of defendants. Plaintiff appealed. Its principal contention is that the judgment was not in accordance with the evidence and that we should make new and independent findings pursuant to R.R. 4:53-1; R.R. 1:5-4(b); R.R. 2:5. The deed in question is dated February 11, 1957. Plaintiff instituted the present suit June 11, 1957.
The record before us reveals that plaintiff, a developer, in October 1956 at a cost of approximately $400,000 acquired title to a large tract of land in Clifton, New Jersey. In November 1956 it applied to the planning board of that municipality for the approval of a subdivision plan to provide for 145 building plots. John A. Celentano, a stockholder of plaintiff and a member of the bar of this State since 1924, as well as magistrate of the City of Clifton, was a witness for plaintiff. He testified that at the aforesaid planning board meeting one of its members, Mr. Sweetman, *485 referring to a portion of the tract of land owned by plaintiff, said that the board "should insist that the developer donate the land for park purposes before they would approve the map"; that in December 1956 at a conference meeting with the members of the city council he answered in the negative an inquiry as to whether plaintiff would donate a tract to the city for park purposes; that he met again with the city council at a conference meeting on January 2, 1957 at which time reference was made by some of the councilmen to a suggestion of the city's planning consultant that the development should contain a small shopping area which would involve a change in part of plaintiff's property from residential zone to business zone; that some of the councilmen "voiced their opinions that if we would give the city some property for a park they would vote in favor of changing the zone." He testified: "This discussion went on for some time. We wanted to be paid for the tract that we were to give the City, because the change of zone was not our idea."
No official action was taken by the city to change the zone designation nor to make provision for a shopping area on the tract in question.
Under date of January 7, 1957 the city engineer wrote a letter to plaintiff's engineer outlining miscellaneous items including reference to plaintiff's storm sewers, drains and catch basins and added: "Deed should be submitted to the Planning Board for the plot to be used for park land prior to final approval."
Mr. Celentano further asserted that on January 11, 1957 he was present at a meeting of the planning board at which one of the members "requested a writing as to the 2-acre deal." The witness added: "He requested that we put this in writing before they would approve our plans, that we were going to give them the two acres. * * * I told them I was ready to give them the two acres as soon as they changed the zone."
He testified that further colloquy then ensued as to what had occurred at the prior council meeting, Celentano stating that "the agreement was that if they change the zone I *486 would give them the two acres." He further testified that at the last-mentioned planning board meeting he sought approval of plaintiff's plot plan; that they "told me without question they would not give me it unless I gave them the park property. * * * The meeting finally ended up that the plan was approved subject to us donating two acres of land, or whatever the acreage is."
The record further discloses that another meeting of the planning board was held February 8, 1957 at which, according to Mr. Celentano's testimony, he was told by the board's chairman that "the engineer would not sign the final map unless we gave them the land for park purposes"; that he then asked for a recess and conferred with Mr. Petruska, president of plaintiff, in an adjoining room, returned to the meeting room and told the planning board that "there was nothing else I could do but accede to their wishes because of the amount of money that was involved in this deal." He testified that he told his associate that "the cost would be so great it might be better to do what they want us to do and go to court later." Plaintiff on this appeal asserts that it decided to give the deed rather than to institute suit to compel the approval of the subdivision application because of the continuing expense of taxes, the loss of interest on the investment, and the fact that the economic loss which would flow from losing the mortgage commitments would exceed the value of the two acres in question. Celentano placed a value of $30,000 on the property as of the date of its transfer to the municipality, and asserted that its present value by reason of the development of Gregory Manor was $50,000 to $60,000. Various portions of Celentano's testimony were corroborated by plaintiff's engineer and by its president.
Evidence on behalf of defendants disclosed that many building permits had been issued for construction of dwelling houses in Gregory Manor commencing March 13, 1957 and continuing during the ensuing months. The court admitted in evidence a deed from plaintiff to Josephine Curreri dated June 6, 1957, which deed described the property by a lot *487 number on the map of Gregory Manor filed in the Passaic County Register's Office on April 18, 1957. The filed map was received in evidence at the trial and bore the legend "Final Plat, Subdivision Map of Gregory Manor Section No. 1 City of Clifton, County of Passaic, N.J." It was dated February 2, 1957. It listed plaintiff as the owner. The following statement thereon was signed by its aforesaid president Michael Petruska: "The undersigned as an officer in the corporation holding title to the hereon subdivided land hereby consents to the filing of this map." The written approval of the map by the planning board and by the city clerk was endorsed thereon under date of March 8, 1957, and the approval of the commissioner of the city thereon bore date April 9, 1957. The map designated the specific property here involved as "City of Clifton Park."
The evidence further disclosed that the deed from plaintiff to the City of Clifton was recorded February 13, 1957. Following the description of the property the following words appear in the deed: "For the uses and purposes of a public park to be maintained and operated by the City of Clifton."
The deed was signed by the aforesaid president of plaintiff and attested by its secretary, and contained the usual corporate acknowledgment stating its execution was pursuant to a resolution of its board of directors and expressing the voluntary nature of the act of the president in signing it.
The deed was prepared by Mr. Celentano. Following execution of the deed he caused it to be recorded and his law firm was charged with the fee therefor. The deed was returned to the firm February 20, 1957. It was then sent by the same law firm to the city. Approximately four months thereafter the present action, charging that the deed was delivered under duress, was instituted.
At the trial plaintiff's counsel elected to cross-examine William Holster, then acting city manager and engineer of the city, concerning matters which had not been covered on his direct-examination. Defendants' attorney objected and the trial court sustained the objection. The following colloquy ensued:
*488 "The Court: * * * If you want to make him your witness, you may do so.
Mr. Heller: [plaintiff's attorney] I should like to make him my witness.
The Court: All right."
Under interrogation by plaintiff's attorney Mr. Holster then testified as plaintiff's witness that he had stated at the meeting on January 11, 1957 that as city engineer he would not approve the map for a subdivision unless the deed was given to the city "[b]ecause at the time that this map was submitted for subdivision there was a letter submitted by the City Clerk of the City of Clifton. This letter stated that Mr. Clenetano [Celentano] and Mr. Petruska had appeared at a meeting of the Municipal Council on January 2 and had offered two acres of land to be used for park purposes. All I was trying to do was to have this reduced to writing."
Under further interrogation by plaintiff's attorney Mr. Holster not only denied that he heard Mr. Celentano state at that meeting that plaintiff would not make a donation of the two acres in question but testified as follows: "In fact, I heard him affirm it. It was just a question of him stating that, did we or did we not trust him? He was going to get the thing in."
Plaintiff's counsel continued to press his cross-examination as follows:
"Q. When did you have the assurance of Mr. Celentano that he was going to deliver the deed? A. The night of the meeting of December 17 of the Municipal Council and also the evening of the meeting of the Planning Board on January 11.
Q. Let us take the meeting of the City Council. Were you present at that informal meeting of the City Council? A. Yes, sir.
Q. You say at that meeting Mr. Celentano promised to give two acres of land for the City? A. Yes, sir.
The Court: Do not forget this is your witness, Mr. Heller.
Mr. Heller: I appreciate that sir.
Q. Did not Mr. Celentano also say that he would not give a deed unless the City changed the zone as requested by the consultant for the Planning Board? A. No, sir.
Q. Was there talk about the change of the zone? A. I did not hear talk about a change of zone."
*489 After further testifying that Mr. Celentano first offered at the city council meeting on December 17, 1956 to donate the land and made the offer again at the planning board meeting on January 11, 1957, Mr. Holster, under continued cross-examination, testified as follows:
"Q. Before that meeting of January 11, you already wrote the letter dated January 7 in which you set down one of the conditions precedent for the issuance of that approval, did you not? A. That is right. This was because on January 2 at the meeting which I attended at the Council Mr. Celentano made that offer together with Mr. Petruska. And I incorporated  of course the City Clerk normally sends this type of letter out. But I incorporated a long list of things that should be considered by the Planning Board.

* * * * * * * *
I have no right to determine whether a man receives a subdivision. I am only one member of a Planning Board of nine. All I did was convey the thought to them that Mr. Celentano and Mr. Petruska had made an offer, a donation; they said they would donate the property, two acres of land."
Plaintiff's counsel then attempted to challenge this testimony by reference to certain depositions the witness had given, and when the trial judge noted that counsel was attempting to discredit his own witness who had shown no signs of hostility, the examination proceeded as follows:
"Q. May I ask him this then: Is it not a fact, Mr. Holster, that at this time in the January 11 meeting you took the view that you would not approve the subdivision as the City Engineer because Mr. Celentano as you say promised to give it to the City at a previous meeting? A. No. Even at that meeting of January 11 Mr. Celentano advised that he intended to give two acres of park. It was a question that things had happened so rapidly that he had not been able to get the deed. He asked me and the Planning Board at the time, `Don't you trust us?' I told him personally at that time it was not a question of me trusting anyone; it was a question of me acting as an employee of the City of Clifton and asking that he reduce it to writing."
Plaintiff's counsel then questioned the engineer as to the events at the meeting of the planning board on February 8, 1957. Mr. Holster replied that the following statement in *490 the planning board minutes, although not taken verbatim, substantially reflected his comment then made:
"Acting City Manager Holster advised that the Board granted tentative approval to Gregory Manor, Section 1, at the January 11, 1957 meeting with the proviso that the deed for a park be given to the City prior to filing for final approval; and developer conform to letter from Engineering Department."
Under interrogation he explained the foregoing action as follows:
"At that time Mr. Celentano said that they would have a deed  there was no question about it  before final reading. On final reading the deed was not there. Even then I recommended and in fact I think moved that the subdivision be given final approval because Mr. Celentano was there and stated again that he would donate the park. It was just a question that I assured the Planning Board that we would get this park because he had promised it and that I would not sign the final map  and you will see that it was signed a week or so later  until such time as I had received the deed. This was only assurance to the Planning Board to try to help move this development along.
Q. Is this true, on February 8: `Acting City Manager Holster moved to approve Gregory Manor, Section 1, with the proviso that the City Engineer be empowered not to sign the approved map until the deed for the park is presented to the City.' A. That is just exactly what I said a moment ago.
Q. In other words, in your motions which were  by the way, these motions were passed by the Planning Board, were they not? A. Yes.
Q. In your motions before the Planning Board you were trying to make sure that that original promise by Mr. Celentano made some months before was carried through by the execution of that deed. Is that not so? A. No. I was trying to assure the Planning Board that these people had made those assurances to us and they certainly would be carried out."
Under further questioning reference was made to the aforesaid recess period during that meeting and the following testimony ensued:
"Q. Did you not at that meeting say, and was that not what precipitated the 10-minute conference that unless you fellows give us the deed today you are not going to get the final approval of the subdivision? A. No."
*491 In entering judgment on the merits in favor of defendants the trial court held that: (a) plaintiff had not established a case of duress or coercion, especially in view of the testimony of Holster whom plaintiff had made its witness; (b) plaintiff, on its assertion that it had originally complied with all of the requirements to warrant planning board approval and that such approval was then being illegally withheld, had available to it an adequate remedy at law by an action in lieu of prerogative writ which it elected not to pursue; (c) there was no evidence of any agreement between plaintiff and the City of Clifton that the latter would rezone plaintiff's land so as to permit the erection of a shopping center. The court then added the following:
"There is the additional phase. Disregard the deeds to these respective purchasers entirely; they file a map with the park delineated on it; that is a dedication of the property to the City of Clifton. It may very well be argued that the acceptance of the deed by the City of Clifton was the acceptance of the dedication.
I do not think this plaintiff has made out a case. There will be judgment for the defendants."
In support of its appeal plaintiff relies on Rubenstein v. Rubenstein, 20 N.J. 359 (1956); Woodside Homes, Inc. v. Town of Morristown, 26 N.J. 529 (1958), and S.P. Dunham & Co. v. Kudra, 44 N.J. Super. 565 (App. Div. 1957), particularly this court's statement (44 N.J. Super. at page 570):
"* * * Thus in New Jersey, after some conflicting decisions on the point, our courts have finally rejected the objective test, namely, that duress is irremediable unless it is of such severity as to overcome the will of a person of ordinary firmness; the test now is simply this  has the person complaining been constrained to do what he otherwise would not have done?"
Plaintiff contends that in the case at bar the "testimony clearly shows that but for the unlawful demands made upon plaintiff, this property would not have been deeded to the city." It is appropriate to observe at this point that, at oral argument, plaintiff's counsel conceded that this suit *492 would not have been commenced if the city had rezoned part of the property for business purposes and that its institution was delayed from February to June to see if such was going to be done.
Our review of the trial court's action is controlled by the limitations imposed by R.R. 4:53-1; R.R. 1:5-4(b); R.R. 2:5. The proper application of these rules is expressed in Capone v. Norton, 11 N.J. Super. 189, 193 (App. Div. 1951), affirmed 8 N.J. 54 (1951), in which this court in an opinion by Judge Bigelow said:
"The Rules remind us that `due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' Beyond that, every intendment is in favor of the judgment under review, and we should not disturb the court's finding of fact unless we are well satisfied that the finding is a mistaken one. McGowan v. Peter Doelger Brewing Co., 10 N.J. Super. 276 (App. Div. Nov. 1950). But respect for the trial court imposes no restraint on our power fully to analyze the proofs and thereby arrive at a conclusion whether the finding is consistent with the evidence."
We have examined the proofs in the case at bar and have determined that, legally and factually, the trial court was amply justified in its conclusion that the deed from plaintiff to the city was not executed and delivered under duress. The trial court determined that it was a voluntary act. The evidence and the applicable law justify that finding. Cf. Woodside Homes, Inc. v. Town of Morristown, supra.
The trial court determined, also, that there was no evidence that the city had agreed to rezone plaintiff's land to permit the erection of a shopping center. Mr. Celentano testified that it was his contention that he had a "verbal agreement" with the city. Any such agreement would be illegal and void. Houston Petroleum Co. v. Automotive Products Credit Ass'n, 9 N.J. 122, 129, 130 (1952); V.F. Zahodiakin Engineering Corp. v. Zoning Board of Adjustment of City of Summit, 8 N.J. 386, 394, 395 (1952).
In view of our finding that the trial court was justified in its determination that the evidence did not establish that *493 plaintiff acted under duress in making the conveyance to the city, it is unnecessary for us to pass on the remaining alleged trial errors raised by plaintiff on its appeal. These involved: (a) contention that the issues defined by the pretrial order did not encompass the question of "dedication" and consequently error was committed in the admission in evidence of the aforesaid Curreri deed, which deed described the property conveyed by reference to block and lot number on the Gregory Manor filed map; also in the trial court's aforesaid reference to the "dedication" resulting from the filing in the register's office of the Gregory Manor map with the park area delineated thereon; (b) the trial court's holding that plaintiff had available to it an action in lieu of prerogative writ if it had believed that approval of its development was being withheld unlawfully by the planning board, which remedy plaintiff contends on this appeal was not adequate within the principle pronounced in Rubenstein, supra, and Kudra, supra. But cf. Lake Intervale Homes, Inc. v. Township of Parsippany-Troy Hills, 28 N.J. 423, 147 A.2d 28 (1958).
Affirmed.